My name is Paul Dayton. I am counsel for Don Benge, Mike Benge, Robert Andrees, and Roxanne Andrees. My clients signed a 15-year non-competition agreement in 1998 when they shared a stock in a business. After five years later, believing that any need for the non-competition agreement had lapsed, they filed suit in the district court to reform, to invalidate through declaratory relief, or to reform the agreement because they believed it, after five years, to be an unreasonable restraint on trade. The fact that it restrained trade is without doubt, it does. The question is whether it unreasonably restrains trade. This case was decided under Oregon law, and the seminal case in Oregon, Eldridge v. Johnson, states the rule clearly. In order, it begins by saying a partial restraint on trade is enforceable if reasonable. In order that it may not be unreasonable, the restraint imposed must not be larger than is required for the necessary protection of the party with whom the contract is made. And Eldridge explains that the usual, the typical justification for a restraint on trade for a non-competition agreement is goodwill. Many other cases have explained that a promise to refrain from ordinary competition is not sufficient to support a non-competition agreement. The Marathon case explains that a non-competition agreement ancillary to the sale of a business is generally appropriate only where the competition from a former owner would impair the operation of the purchaser beyond that which would arise from the competition of an unrelated third party with similar marketing skills. The magistrate took testimony for five days on the question of whether or not this, these non-competition agreements were unreasonable restraints on trade, and after, and recounted the testimony that she heard in a way that I think both sides think was basically balanced and fair, and she reached what she, having recounted what, the testimony that she heard, she reached the question that she thought was the critical question, which is whether or not the 15 years, as she put it, the critical issue is the length of time that is necessary to protect Western or any restriction at all. And this was her conclusion in her legal analysis. She said, the purchase price paid by the Group 1 shareholders included a substantial premium over the tangible assets of WCI. Although this Court is unwilling to conclude that all of that premium is attributable to the 1998 non-competition agreement, certainly a large portion was. Bankers received the benefit of the 1998 non-competition agreement in the form of a higher purchase price for their shares, and should not be able to use those additional funds to do the very thing prohibited by the 1998 non-competition agreement. So what the Court has said, the Court has not identified any continuing need to protect customer relationships over that next decade that follows the first five years of enforcement. It has instead said, well, they paid for it, and they shouldn't be now, they were paid for their shares. They should not now be able to use those funds to compete against Western Coding. Well, that's the kind of prohibition of ordinary competition that no non-competition agreement may restrict. That is illegal per se. And that is what the cases that we have cited to the Court explain. So the question that we have to start with is, is there any basis in the record to support a legal conclusion that a 15-year non-competition agreement is justified to shield the customer relationships from my clients in comparison to the ordinary competition that any business must face in the marketplace? Is there anything that justifies the legal conclusion that after five years, my clients are different than Harris Rebar or any number of other companies that might have engaged in the same kind of competition? Well, there is no evidence in the record to support that. No one explained why 15 years was picked. Certainly, the trial court recognized that in the industry, non-competition agreements are not used. Western Coding didn't use them. Far West Steel didn't use them. Mr. Patrick, who was the Vice President of Far West Coding, or Far West Steel, had never heard of them being used. There's a reason. Steel is a commodity. We're not selling a relationship at this point. Rebar is just material that needs to be shipped to a construction site. And the competition to sell it is about price and, clearly, reliability. Right. I mean, I don't know. I mean, you could say anything's just a commodity. Do you buy your commodity from GM or do you buy it from Ford? Well, I would say, Your Honor, I'm currently in the midst of litigating a non-competition agreement signed by an insurance broker. And it's an entirely different situation. There is a service relationship between the broker and the business. He's on the phone all the time dealing with their problems. And they come to trust him and rely upon him to be responsive. And they just like him. He takes him golfing and it's just a satisfactory relationship. When you buy rebar, you're buying large quantities for a fairly high price. And you've got to include that on a publicly bid project where you need to be low. So your driving interest is low price. Yes, you want reliability. But it's different than that service relationship where you're more interested in that personal relationship. So non-competition. In the public bidding context, even a public entity isn't necessarily required to take the lowest bid. They can take reliability, past performance, and will the goods actually be delivered, all these other intangible factors that relate to who stands behind that product. That's plainly correct. They're not going to deal with someone they can't, they don't believe can do the job. Because if they don't, then obviously that impairs their own ability to perform. So there's a threshold you've got to get over. If you aren't a responsible bidder, they're not going to deal with you. But the marketplace is full of people who are. And among the people who are responsible bidders, they're going to select the lowest price as long as they're satisfied the job can get done. But the record demonstrates that there is, in the steel industry, non-competition agreements are simply not used. And in the industry, frankly, in general, the sales of businesses, 15-year non-competition agreements are unheard of. In the real world, five years is a typical period for a non-competition agreement. That's what Barbara Steele asked of the executives when it bought Western Coating. That's what Neil Beaton, the expert for the plaintiffs, testified to at trial. He's an expert and values non-competition agreements. And he said he'd never heard of one longer than five years. And when you think about it, it makes some sense. Why would people pick five years? Look at this case. Look at what Far West Steel did when it bought Western Coating. It knew that it needed to solidify its business relationships. It was a new company buying Western Coating. It needed to preserve those customer relationships. So it brought back Mr. Reed, who was in charge of Western Coating, to help it reassure customers. It would deal with the customers. And it went out and had meetings with them to assure them that it would continue to be a very responsive and a strong business partner. But after five years, that was all done. They were all gone. Reed left. All the client managers left. And Solomon was promoted, actually, above the level of dealing with customers. They didn't need that anymore because they'd solidified the business relationship. That's what that  Now, the non-competition agreements of that period are quite typical. But the parties kind of thought it would take 15 years. Well, that's a good question, Your Honor. The parties, the record indicates that the purpose of back in 1984, 14 years before these non-competition agreements were signed, the purpose of the non-competition agreements was to prevent competition. And Mr. Stewart, who wanted them, wanted to prevent competition wherever he could find it. It was not a concern about goodwill. Because remember, Mr. Stewart was the person who did not value goodwill at all in the merger of the two businesses. And subsequently Of course, that agreement's not before us, is it? In other words, aren't we talking about the later non-compete? Well, yes and no. In 1984, the parties agreed to merger and to a stock purchase agreement. It's that 1984 agreement that compelled my clients 14 years later to sign the non-competition agreement. So there was no discretion after that. Do we have to look at what happened when they signed it? In other words, it's the factual situation at the time of signing this non-compete agreement that dictates how we go, doesn't it? Well, again, I would have to answer the question yes and no. Under Eldridge, the test is the time of contract formation, which is in 1998. But the parties had no discretion to define the terms of the agreement in 1998, because it was called for in the 1984 non-compete or the stock purchase agreement. So from that point forward, they could do nothing but sign it at the point when they signed it. Couldn't they have renegotiated? Couldn't they have renegotiated the term at that point? Oh, could they have? Yes. Well, they had no contractual right to do that. They, under the shotgun provision, which meant that upon tender, my clients either had to buy or sell. And since they didn't, they chose not to buy, they had to sell, and there was no negotiation. The price was determined. The obligation to sign the non-competition agreement was determined. They simply had to follow the terms of the 1984 non-competition    They had no right to do that. So this is not the usual case in which you can determine from the parties' very agreement, frankly. In your average sale of a business, when the parties sit down and agree to a non-competition agreement, you can assume that individually they thought about it, they negotiated it, they decided what's a fair number for this business. And you can have a fair amount of confidence that the parties gauged the need to protect goodwill. Did you prepare that 1984 agreement? Did I? Yeah. I was barely out of law school. I was going to say, whoever did it, did a pretty good job. I mean, there wasn't much left for 98. No, it was set in stone from 1984. So we've seen, there's nothing in the record explaining the step from 5 to 15. We've also seen that it's very common in industry, although in the steel industry, non-competition agreements are not common at all. But to the extent that in industry, non-competition agreements are common in the sale of a business, five years is a very typical time frame. So why in this case go from 5 to 15? What's the justification that's invoked? And in the trial court, Western Coding was clear. The justification is to shield the investment that they had made. They wanted to preserve the ability to get higher prices than they would have gotten if they had to face competition from Western Coding. Look at the trial brief that was submitted by Western Coding. It's page 243 in the evidentiary record. I quote the counsel for Western Coding, Obviously, new entry by the ABC companies will probably reduce prices and almost certainly would reduce WCI's sales. And he went on to say, But WCI's favorable market position was part of the goodwill that plaintiffs sold and were paid for. While WCI must fend for itself against others seeking to take market share from it, it should not have to occur such loss of market share to its former partners who were paid a premium price reflecting WCI's market position. And this convinced the trial judge. This is what she agreed with. But this is wrong as a matter of law. The Marathon case is a very good illustration at this point. Goodwill, protectable goodwill in the context of a non-competition agreement, may not shield ordinary competition. It may not shield the ability to collect the difference between the hard assets and the total revenues of the business. That's the kind of revenue that's at risk in any business competition. A non-competition agreement may only shield that which is vulnerable to competition by the party to the agreement itself. And Western Coding isn't concerned in its trial brief about the fact that Mike Benjamin knows a customer in Arizona. It's concerned about the fact that it's got a 60 to 70% market share, 25% profit margins, and it doesn't want to face another competitor in the marketplace. And the San Mateo Bridge case is a classic, clear example of why. The details of the... Sure. Is it possible to distinguish the Benjes from the Andres in terms of their reasonableness analysis? Yes. The Andres were never involved in the operations of Western Coding in the slightest. They live in Texas. They were part of ABC companies. They were investors, and that's all they were. In the case of Don Benj as well, Mr. Benj was on the board, but he was never part of the operations of Western Coding. Right. To follow up on that question, as a practical matter, if the Court were to consider reforming, say, the Andres because they were never part of Western Coding, but not the Benjes because they're still associated in some people's minds with Western Coding, as a practical matter, do the Andres operate independently from the Benjes so that if they sold Green Raybar to a customer, it wouldn't be looked at as ABC companies as a whole, which is run by people from Western Coding? Well, I would answer it in this way. I would say Andres has always been part of ABC Coding companies and not the Andres have been part of that company and not part of Western Coding. Is it possible that some customer of WCI knows of their business relationship and family relationship? Probably. But it's pretty isolated, and there's no showing that they've ever been part of a customer relationship. So there isn't any material connection between them. And I think that if the Court were inclined to reform the order and continue to restrain Mr. Benj or the Benjes, clearly they would be, to the extent there is restraint, it would prevent them from cooperating or working with the Andres in any business effort that might lead to that kind of confusion. So I think a recently drafted order could carve the Andres away from the Benjes. But I also want to point out that even with respect to, and I'll come back if I have enough time, to the issue I was just addressing, but I don't want to miss the geographic issue either. Mr. Benj worked in Washington. Don Benj didn't work in Western Coding at all. Mr. Benj had dealings in three states. By the time that we went to trial in this case, he had contacts with nine out of 130 customers at Western Coding. There is no continuing need to prevent Mr. Benj from dealing with customers at a minimum outside that three-state area. Even within that three-state area, his contacts are so isolated that he makes no material difference. The Court could easily reform the agreement to prevent him from dealing with customers he used to deal with and be satisfied that it had protected WCI's goodwill while allowing free and fair competition. For example, in California, where Western Coding used in the San Mateo Bridge Project, it used this non-competition agreement, attempted to use it, to exact a 10 percent higher price than it would have exacted otherwise. There, it refused to deal with a customer that it thought couldn't serve as a contract, believing it would ultimately get a higher price. When Western Coding finally stepped in and supplied the project, only then did they back down and accept a price that's closer to what market would be if there were full and fair competition in this marketplace. And at the end of the day, that's what the Court has to decide. Is this 15-year non-competition agreement shielding WCI from a formidable competitor who will undercut it on price, as in the Marathon case, or is it properly against a competitor who has continuing personal contacts and relationships throughout every Western state in the United States that would impair Western Coding's ability to preserve those customer relationships? I think the answer at this stage is the same as it was in Marathon. There is no continuing need to shield unique personal relationships or something about the connection between the benches and WCI. At this point, Western Coding wants what it said it wanted in its trial brief. It wants the higher prices it will get if it doesn't have to fight, compete against my clients. If we were to decide that the contract needed to be reformed as to some of the plaintiffs but not all, would that put the unjust enrichment claim back on the table? Well, in theory it would, but I would point out that because the claim would be made that whoever gets improved by this outcome would now arguably, Western Coding will claim that we shouldn't have paid them as much for their shares, but I would answer that Western Coding didn't pay them anything. And beyond that, if this Court decides to reform the agreement, it is fundamentally concluding that for those people, to whatever extent it reforms the agreement, it's doing it because those individuals do not pose a competitive threat or an unfair competitive threat. So at that point, there's no need for disengagement, the very premise of the change in the agreement. But if they posed no threat, then in theory they were entitled to no money, if you look at it totally objectively. Well, that's not the case at all. The reason that WCI thought it was worth, or when shareholders thought it was worth $8 million is because, number one, it had hard assets that it could use to make epoxy-coated rebar. Number two, it had a history of dealing with customers, and it had a position in the Northwest where it was a formidable competitor against anybody in that marketplace. It's still that thing. The next day, even if someone tries to set up shop across the street, it's still the business that it has been. Now, if you decide seven years later to leave two or three of the parties to the non-competition agreement... I'm sorry. I didn't follow that. If you pay a lot of money for goodwill as the buyer, and then you set the goodwill up on your balance sheet and it stays there, you can't do anything with it. You can't ever get that money back. If you pay it for hard assets, you can depreciate the assets and get the money back. So you don't want to assign very much, if anything, to goodwill if you can avoid it. Right. And that's the record as a consequence devoid of goodwill. All right. Thank you, counsel. Good morning. I'm Barnes Ellis, and I represent Western Coding. Counsel and I agree on a few things. One is Eldridge is the controlling case. That's the competing Oregon case. It's actually referenced in the operative covenant document. Eldridge itself states a very strong public policy to enforce agreements between business people and specifically to enforce non-competition agreements, subject to three limited exceptions. One is the non-competition agreement must be reasonably necessary to protect goodwill. Now, the trial judge here had a six-day trial. She made 30 pages of fact findings. Counsel has significantly understated her fact findings. Her fact findings were very clear that the goodwill here was substantial and that it includes not just the personal customer relationships that Michael Bench had, but it included the reputation that WCI developed during 14 years of common ownership. And that reputation is not limited to Washington. That reputation is Western-wide. And she found that there was marketing materials distributed during the 14 years that commingled WCI with ABC, the companies back in Colorado and East. She found that Mr. Michael Bench would benefit from that company-wide reputation today. A key thing I think you need to keep in mind, this is the green bar component of the rebar industry. It's a small specialty niche product. There is near complete continuity of the customer base. The trial court here found that six years into the covenant, there was over 90 percent overlap of current customers from customers that existed in 1998. She found 100 percent overlap of the top five customers from the top five customers of 1998. She found that the relationship between ABC and the Benches and WCI is well known in this industry. She also found that this is not a pure commodity of the kind that counsel likes to describe. This is a service industry, this niche component. Product reliability is key. You want to make sure that you have the right products so there are no gaps or holes or the bends are not correct or the sharing is not the right length or the bundle count is not accurate. Any misstep on one of those things and a whole job either gets slowed or stopped. And if there's a quality deficiency, as they found in the Florida Bridge Project in the 90s, the whole problem with the product is critical. And what she found was that for 14 years these two parties had worked together building that reputation. If the one who sold was permitted to come back in, the one who sold would get the benefit of the reputation that the two of them had built together. And there's another component that counsel has not mentioned. A big part of the competition that we have is the engineer specification level. Much of the ultimate market are state departments of transportation in all the western states. It is critical to the success of this company that the engineers for the DOTs specify green bar. There are about seven other competing products, stainless steel and a range of others. So this company during this 14 year joint ownership and its continued success, but during the 14 years spent an enormous amount of effort to sell the product to the DOT engineers. That effort has continuing benefit today. If the Bendys were allowed to now come back in and, as he says, compete, they would be free riders. They would get the full benefit of that effort that still has significant continuing benefit in the market today. And the trial judge yet so found. She was very specific in her findings that the full 15 years was reasonable and necessary. She found that not only because there were three sources of information that indicated that is a fairly reasonable period over which to amortize the asset, the intangible asset being purchased. And those three sources included Far West itself, which was the second step of the transaction that took place in 1998. Group 1 bought from Group 2 in order to sell to Far West. Far West developed a pro forma looking at what it would need to achieve in order to earn back the purchase price that it was paying. And it used a 15 year period to accomplish that. On the Bendys side, when they were looking at themselves being buyers and not sellers, they, too, analyzed that a 15 year amortization period would be appropriate. You have to look at their pro forma to understand that. But that was so. And that was in 1984 you're talking about? No, no. In 1998, when the Bendys family were given the opportunity, you can be a buyer or a seller at the $8 million price. They were given that opportunity in 84, weren't they, by the end of 1998? Yes, it was. Let me walk through the time sequence because I can see. I'm sorry. I've got it wrong. Straighten me out. 1984, the two of them merged. When they merged, they signed a stock purchase agreement. The stock purchase agreement talked about Group 1 and Group 2. Group 1 was the Oregon group. Group 2 was the Bendys group. After three years, either group could put the shotgun on the table. And if they put the shotgun on the table with a price, that meant the other side had to decide, are you a buyer or a seller at that price? So that was the 1984 arrangement. Fourteen years later, in 1998, Group 1 put the shotgun on the table at an $8 million price for the 50% interest. At that point, the Bendys looked at it and were analyzing the question, do we want to be a buyer or do we want to be a seller? They wanted to be a buyer, but the price was a very favorable price. And so they concluded they needed their funds for their other business, and they concluded they would then be sellers, not buyers. But when they were thinking of being buyers, they had two views. One performer is a 10-year performer, but it has losses in the early years. So when you factor it out, it becomes a 15-year performer, and the other was 15. The third subject matter was the accounting rules, which one of you, I think, commented on. And those happened to be a 15-year amortization for the district court. So all of these factors were taken into account by the district court in concluding that the full 15-year period was a reasonable period. I'd be happy to address more on that, but let me go to this question that you asked, Your Honor, about whether Roxanne and Robert Andrus should somehow be separated out. First of all, they've always been part of a group in the contract. They're referred to as part of Group 2. If you look at the letter that Donald Bench wrote denying that they were breaching the covenant in connection with San Mateo, he refers to the Bench-Andrus group. They are co-owners. Roxanne is the daughter of Don Bench. She's the sister of Mike Bench. Her husband is obviously a family member. They are the co-owners of the Colorado operation, the Texas operation. So the notion that they could be split out is far more theoretical than practical. Was there any evidence of them having any contact with any of the DOT people? No, I don't contend that. They would certainly get the benefit of that product proselytization that occurred. They would be, in essence, free riders on that, because that work has been done. So if they came in, they would, in fact, be getting, back through competition, something they were paid for in the sale of their shares. But I don't contend, and I don't think the record would support, that they had direct customer communication or contact. But as looking at Robert and Roxanne's relationship with the group, what we have to do, or don't we have to look at their relationship to the company and competition and what impact they have on how things have gone? In my view, since they dealt as part of a group in all their contracting relationships, since they were selling a percentage of the whole company, not a percentage of a fraction of the company, I think it's entirely fair to continue to treat them as a group. I also don't think that a pure financial owner who is not a manager, somehow that you couldn't have a lawful, noncompete agreement with a pure financial owner. Money is a big part of competition. They have the money from the sale of that interest. And I think it is true. Several courts have used this language, and Judge Stewart did also, that it's fundamentally unfair to let them take the competition agreement and then use it to engage in the very action that they agreed not to do. But I don't think you need to only look at it from the standpoint, I don't think only managers can sign noncompetition agreements. I think owner-sellers can sign those agreements and they will be enforced. But you're looking at competition and interest in preventing competition and so on. And if these people are nonoperative in the company, then how do they have any impact on how this company competes other than as shareholders, which is pretty slim. Well, I'm not arguing that Roxanne and Robert were active in the market. I mean, Robert was active in the Trade Association nationally and knows some of these people. But I'm not going to argue that they were active in the market. They were an integral part of the shareholder group. And I think it is I think it would be unrealistic to say, well, they can come in and somehow they're going to operate entirely separately from the family enterprise that they've been an integral part of for as long as this activity has occurred. So I think it's just a very impractical thing to try to break them out. But if the agreement continued as to Michael, he could not indirectly do through them what he could not directly do under the terms of the agreement, isn't that so? That would be true. So there'd be some protection there. Yes, I think the risk of dispute is pretty high. If the Andres tried to say we were operating independently of our father and our brother and the string of companies that we currently manage and operate, we'd probably have a fair number of disputes as to whether that was true. But your comment is correct. I do want to address this argument Council makes that non-competition agreements are not common in the industry. First of all, he doesn't limit his comment to the specialty niche product component, the green bar. So much of what he refers to refers to the black bar industry, which is more like a commodity than the green bar. Secondly, he doesn't cite any instance that's analogous to this one where you have partners selling an interest in a company, where those partners have right on the fringe of the territory existing businesses ready to enter at any moment. This is not an idle situation. If you were to allow them to not honor the agreement that they made, they're in a position that this competition would start tomorrow. The other people that he's referred to over time are ones who would have to start a whole new business who are far less likely. And then thirdly, it just doesn't seem to me particularly germane to say that somebody who did agree to a non-competition agreement somehow should be relieved of that contractual promise because some other people over there did not. I don't think that's controlling. Now, one other point I wanted to address. There were questions whether the 1998 agreement reflected the intent of the parties involved for a 15-year covenant. And he makes the argument that really that decision was made back in the first agreement, 1984, not in 1998. I would make two or three comments on that. In 1998, and this was not required by the 1984 document, the sellers also signed a rep and warranty document that said they represent and warrant that this non-competition agreement is valid, legal, enforceable, and binding. Now they were not contractually obligated to do that, but they did do that. So I think that act in 1998 is the equivalent of them agreeing in 1998 that 15 years is reasonable. The trial court pointed out that if in 1998 they believed that 15 years in the western states was excessive, they could have but chose not to do that before taking the money. They did not litigate it before taking the money. They took the money, and now they want to litigate it and keep the money. That's another argument why the action that took place in 1998 is the equivalent of a 1998 volitional agreement. And it's not just coerced because of 1984. The third point I'd make is these covenants, he likes to refer to them as restraints on trade, and we're all supposed to react negatively to that. But these covenants really can be looked at like patent protection. They perform a very important positive benefit. And in this case, there were two. One is without that covenant, they would not have gotten the premium price that they achieved. And if courts too quickly invalidated or curtailed covenants, sellers of businesses like the Benjes would not get the premiums for intangibles that they achieved in this case and would like to achieve generally. And secondly, the existence of that covenant played a very important part in the 14 years that these parties operated together. There isn't any question that the Benjes would have been very uncomfortable letting Group One manage the business during those 14 years. If the Benjes had thought, had they become a buyer, Group One could immediately attack them competitively. And there isn't any doubt that the Group One managers would have been very uncomfortable giving Mike Benjes the position he was given in the Washington market as the face, the eyes, the ears, the presence of Western coding. If they had thought, he could shortly after that, if he became a seller, come back in and take advantage of it. So the 14 years that the knowledge both of them had that this covenant would take place whenever one or the other bought the other out played, in my view, a very beneficial function in integrating the operations and building the kind of trust between these two otherwise separate ownerships. So I don't think it's right to think of non-competition agreements as somehow anti-business or anti-competitive. This particular covenant was beneficial in the 14 years as the glue, and it was beneficial at the time of sale because it gave the protection that allowed pricing at the very top. And you know they got away with it. They got a very good price because they wanted to be buyers, but this price was so attractive they concluded they couldn't afford to do it. And that's why this covenant was important. You responded to my questions about Robert and Roxanne talking about their activities within the group as opposed to perhaps their activities within the competitive market. Correct. Is there an Oregon case that involves that approach to analysis of this kind of agreement? I can't say that I know of one. Eldridge, of course, did involve an employee co-owner. Asbury v. McCallum involved a professional medical professional in the group, and the Thompson optical case involved a seller of business, but he had been an employee for a long time. I can't say that I know of a case involving that. It's just logic. All right. Thank you very much. Thank you, counsel. Benge v. Western Coney is submitted. Did he have any time left? Mr. Dayton, do you have any time left? No, I think he was on. Okay. Well, we'll submit the case and hear argument in St. Joseph's Hospital v.
judges: Thompson, T. Nelson, Wardlaw